ISRAEL DVORINE ET AL. *v.* CASTELBERG
JEWELRY CORPORATION
[No. 51, April Term, 1936.]

*Decided June 10th, 1936.*

The cause was argued before BOND, C. J., URNER, OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*Edward L. Ward,* with whom were *Harold Kohn* and *Gordon S. Duvall* on the brief, for the appellants.

*Charles McH. Howard,* with whom was *Philip Sachs* on the brief, for the appellee.

*Herman M. Moser,* counsel for the Retail Merchants Association of Baltimore, filed a brief as *amicus curiae.*

OFFUTT, J., delivered the opinion of the Court.

The Castelberg Jewelry Corporation carries on a merchandising business in Baltimore, in connection with which it maintains stores for the sale of jewelry, silverware, optical goods, ornaments, and other wares of the same general character. As a part of its business it conducts a branch or department for the sale of eyeglasses, and to stimulate that part of its business it furnishes optometrical service to such of its patrons as desire it, and for that purpose employs a registered optometrist, and supplies him with the instruments and mechanical

appliances needed for that work, as well as with an office in which it may be done. In the course of the service the optometrist examines any patron presenting himself for that purpose and informs him of the result of the examination. If, as a result of it, glasses are found to be needed, the patron may purchase them from the corporation, or from some other person, or he may purchase them from the corporation with or without a prescription. Where the glasses are not bought from the corporation, a charge is made for an examination; if glasses are bought from it, the charge for the examination is included in the price of the eyeglasses. But whenever a charge is made, whether for an examination or for eyeglasses or lenses, it is made in the name of the corporation, and the corporation informs the public through advertisements in the public press and otherwise that it specializes in "the scientific fitting of modern glasses and frames" and offers "consultations and examinations without charge." The actual physical work of the examination is done by a registered optometrist, who, as a result of it, determines whether any glasses are needed and, if they are, the particular kind which are required, their measurements and shape.

As a necessary consequence of that course of business, the company receives any profits and bears any losses which may result from the examinations and sales of eyeglasses, but the patron nevertheless is assured of the service of a competent and skilled optometrist. Or, stated in another way, the company supplies the service, and in that sense practices optometry in making it available to its patrons, but the service is actually performed by a natural person who is registered and licensed by the State to practice the art or science of optometry.

The basic act regulating the practice of optometry in this state is chapter 652 of the Acts of 1914, which created the "Maryland State Board of Examiners in Optometry." The essential purpose of that statute was to limit the practice of optometry in this state to persons who were found to possess the skill, competence, and

training needed for the examination of the human eye and the prescription of suitable lenses to correct errors in vision without detriment to the public health. In addition to providing for examinations to insure the requisite competence, the statute provides for the registration of persons found to be qualified to practice the art, and makes it unlawful for persons other than physicians or surgeons to practice in this state without first having been registered as optometrists.

It defines the practice of optometry as "the employment of any means, except the use of drugs, medicine or surgery, known to the science of optics for the purpose of determining, correcting and prescribing by means of lenses for any optical condition existing in the human eye, and also the employment of any means, except the use of drugs, medicine or surgery, for the purpose of detecting diseased conditions." Code, art. 43, sec. 315.

It also prohibits the use by optometrists of "the title M.D., Surgeon, Doctor, Physician, Eye Specialist, Eye-Sight Specialist, Oculist, Opthalmologist, Doctor of Opthalmology, Doctor of Optometry, Doctor of Optics, or any title containing the word Doctor or the abbreviation Dr., or any word or abbreviation that will or can convey the impression that he is engaged in the treatment of diseases or injuries of the human eye, or make use of drugs, medicine or surgery, in the practice of Optometry" (Code (Supp. 1935) art. 43, sec. 326), although those who have obtained a degree as such may use the title of "Doctor of Optics" or "Doctor of Optometry." Otherwise the optometrist must use the word "Optometrist" in connection with his name, wherever his name appears. An optometrist who is also a physician and surgeon is not affected by the statute, and may use the title of his profession, nor does it apply to persons who merely sell eyeglasses as merchandise, nor to opticians.

The Maryland Association of Optometrists is a corporation formed to further the interests of optometry, and the Maryland State Board of Examiners in Optometry is an administrative agency created by chapter 652 of

the Acts of 1914, and charged with the administration of that statute. Israel Dvorine, B. Woodward Hazel, J. Fred Andreae, Martin Roos, and Ralph A. Highbarger at present constitute the board. On August 14th, 1935, these five persons, as individuals and as constituting the Maryland State Board of Examiners in Optometry, herein called the Board of Examiners, and the Maryland Association of Optometrists, brought this suit against the Castelberg Jewelry Corporation to secure an injunction restraining it (a) "from engaging in the practice of optometry in the State of Maryland, either directly in its corporate or trade name, or indirectly by hiring licensed or registered optometrists to engage in said practice for it at its place of business or elsewhere," and (b) "from holding itself or themselves out as having the right to practice optometry, and from advertising that it has the right to prescribe lenses and make examinations of the eyes, and from prescribing, fitting, adjusting or selling lenses for correcting or aiding the optical condition of human eyes, and from employing, engaging or contracting with any licensed or registered optometrists to carry on or conduct the practice of optometry for it at its said place of business or elsewhere."

In their bill of complaint, in addition to the facts stated above, they allege that under its charter the defendant was authorized "to manufacture, buy, sell, rent, and otherwise deal in jewelry, silverware, ornaments, novelties, optical goods, as well as goods, wares and merchandise of every class and description. * * * To carry on any other business which may be calculated directly or indirectly to effectuate the aforesaid objects or any of them, or to facilitate the transaction by the corporation of the aforesaid businesses, or any part thereof, or the transaction of any other business which may be calculated directly or indirectly to enhance the value of its assets and property." It is further alleged that the defendant maintains an optical department which "is under the supervision and direction of an employee of the defendant corporation, who is a licensed or registered op-

tometrist of the State of Maryland, and in which optical department the defendant corporation through its said agent or employee has been and now is continually determining, testing and examining the optical and diseased conditions of the eyes of persons at its said place of business, and is attempting to correct such optical conditions by means of lenses prescribed and sold to said persons with such defective and diseased eyesight, for and on behalf of said defendant corporation; and the public has been and is now being continuously solicited by the defendant corporation by extensive advertisements inserted in the daily newspapers published in Baltimore City and by divers other ways and means to call at the jewelry store conducted by said defendant corporation at the aforesaid address, to have their eyes tested and examined, and consultations held with said registered or licensed optometrists, employed by said defendant corporation, without charge and prescribing by means of lenses for optical conditions of the eyes, and for the further purpose of having the public purchase such lenses as are prescribed by its said employee to correct and overcome such optical conditions." They further state that the defendant is unlawfully practicing optometry and "exploiting commercially" the certificate of registration issued to the registered optometrist employed by it, and that by such "illegal practice of optometry" the defendant "is building up a tremendous volume of business in the sale of prescribed lenses and eyeglasses, for the correction of optical conditions of the eyes, which unlawful acts are highly detrimental to all licensed practicing optometrists in the State of Maryland, the larger portion of whom are members of said Maryland Association of Optometrists, Incorporated; and violates the duties imposed by law upon the Maryland State Board of Examiners in Optometry."

To that bill the defendant filed a combined answer and demurrer. In its answer it in effect admitted the allegations of material fact made in the bill, but denied that it was engaged in the practice of optometry within the

meaning of the statute. The demurrer was disregarded, testimony was taken in connection with the pleadings, the case was heard, and on December 16th, 1935, the court by its decree of that date dismissed the bill. The appeal is from that decree.

The testimony added these facts to those stated: William B. Rutter, the optometrist employed by the defendant to conduct its optical department, is employed at will; he is compensated by a regular salary and commissions; the instruments and appliances used in his work are furnished by the defendant, as is his office; all charges are made in its name; all advertising is in its name, and while it may state that the examinations are by a registered optometrist, his name is not mentioned; the acts of which the appellants now complain as constituting the practice of optometry have been common and usual in this State both before and after the passage of the Act of 1914, and both corporations and natural persons have, since the passage of the act, furnished through the agency of registered optometrists service similar to that offered by the defendant without hindrance. It also appeared that in 1935 a bill was introduced in the Maryland House of Delegates the purpose of which was to make such acts unlawful, but it failed to pass.

From these facts it is apparent that the important question submitted by the appeal is whether one who offers to furnish, or does actually furnish, through the agency of a registered optometrist, such service as may be required to determine whether persons applying therefor need eyeglasses, and if so what kind of eyeglasses they need, is himself practicing optometry within the meaning of the statute, although there is another question which should perhaps be first considered. That is whether the appellants, or any of them, have such an interest in the subject-matter of the litigation as will entitle them to demand equitable relief.

Without laboring the question, it may well be doubted whether the Board of Examiners as such has the power to maintain such a suit. Its duties, which are very clearly

defined in the act, do not include that of enforcing its provisions by civil litigation, and indeed there is nothing in the language of the act to permit the inference that the board may use the monies, which it receives to enable it to function, to engage in litigation in which it has no interest.

The optical society and the individual plaintiffs are, however, in different case. The society is incorporated for the "encouragement, protection and furtherance of the interests of optometry," and the natural plaintiffs are themselves engaged in the practice of optometry. The society has no property interest affected by defendant's acts, and its right to sue is not apparent, but there is some force in the suggestion that these natural persons do have an interest as licensed optometrists in being protected against the competition in that business of unlicensed persons operating in violation of law, which could, without substantially expanding the meaning of the term, be classed as property. The cases are not in harmony on the question, but there is authority of some persuasive force which sustains the right of one lawfully engaged in business under a license from the State to equitable relief against illegal competition. *Fitchette v. Taylor,* 191 Minn. 582, 254 N. W. 910; *State v. Fray,* 214 Iowa, 53, 241 N. W. 663. It is suggested, too, that violation of the statute is by its terms a criminal offense, and that equity will not interfere with the administration of the criminal law. It is true that equity will not lend its aid to prevent the violation of criminal laws (14 *R. C. L.* 376), but will leave that to the criminal courts and the police, but the mere fact that the wrongful act is a crime will not prevent a court of equity from dealing with it, if it operates to cause irreparable injury to the complainant's property, or causes him pecuniary harm, for which there is no legal remedy. *Ibid.*

It becomes unnecessary to decide the question in this case, however, because while it could have been considered by the trial court on the defendant's demurrer (*Fletcher's Equity Pleading,* p. 249; *Miller, Equity Proc.*

278, 279), the defendant made no point of it in this court, but preferred to rest its defense upon the broader ground that it is not practicing optometry within the meaning of the statute. Inasmuch as its failure to raise the point in the trial court would have prevented its consideration by this court (Code, art. 5, secs. 40, 41; *Carrington v. Basshor Co.*, 121 Md. 71, 75, 88 A. 52), there is no sound reason why it may not be waived in this court even though it was made in the trial court, in view of the fact that that court did have jurisdiction to deal with the subject-matter of the suit, whether the acts complained of were unlawful, and, if unlawful, whether they caused harm to any property interest of the natural plaintiffs, or resulted in pecuniary loss to them for which they had no adequate remedy at law.

Reverting to the question first stated, whether, upon the record in this case, the appellee is engaged in the practice of optometry within the meaning of the statute, in seeking the legislative intent, it may be helpful to consider briefly the purpose of the legislation. Manifestly that purpose was not to protect the financial interests of persons engaged in the practice of optometry, but to protect the public against injury or harm which might result if ignorant, unskillful, or incompetent persons were permitted to offer their services as optometrists indiscriminately to all who might apply to them for aid in correcting errors in vision. The art or science of optometry requires a degree of skill, judgment, experience, and training, and even education, beyond that usually needed in the ordinary mechanical arts. It deals with one of the most delicate and sensitive organs of the human body, and even slight errors may result not only in impairment of vision, but also in injury to the nervous system or other serious and lasting bodily harm. On the other hand, it is essentially a mechanical art, which requires skill, manual dexterity, and a knowledge of the use and application of certain mechanical instruments and appliances designed to measure and record the errors and deviations from the normal which may be found in the human eye,

rather than the knowledge and learning appropriate to professions or callings which deal with causes and conduct rather than with conditions and effects. It is in its nature empirical rather than learned. The principal concern of the State, therefore, is not so much to protect the calling itself, as is the case in law and medicine, where the public interest may properly demand greater mental and cultural qualifications than are needed to permit one to perform the duties of an optometrist, as it is to see that none may practice that art who are not qualified to do so without detriment to the public. It is suggested in the very able argument of the appellants that it is a learned "profession," and some authority is cited in support of that contention. *State v. Kindy Optical Co.*, 216 Iowa, 1157, 248 N. W. 332; *Eddy v. West Virginia Board of Optometry* (W. Va.) 182 S. E. 870; *State v. Goldman Jewelry Co.*, 142 Kan. 881, 51 P. (2nd) 995. But to so describe it is to use the phrase as a trade name, rather than to change its historical significance. While literally the word "profession" may be applied to any calling requiring special knowledge of some branch of science or learning, historically and ordinarily it is limited to such avocations as the law, the ministry, medicine, military science, engineering, and the like. Its use in connection with the practice of optometry is merely illustrative of a euphemistic trend, apparent in recent years, of converting age old and common callings into "something new and strange," not by changing their characteristics, but by describing them in more dignified and sonorous terms. But, however praiseworthy that purpose may be, it cannot be permitted to obscure or distort actual facts or conditions.

The liberty of one, found to be qualified to perform the duties of an optometrist, to engage in that calling, is a right, while that of one to engage in the practice of law is, whatever his qualifications may be, a privilege, which the State may grant or withhold. So that a course of conduct may be tolerated in the case of a mechanical art, trade, or calling, which would be regarded as wholly

objectionable in the case of a profession such as the law. When therefore the word "practice" is construed in connection with a statute regulating such a calling as optometry, consideration must be given to that distinction, unless the statute clearly manifests a different intent, for it will not be presumed that the Legislature intended to interfere more than the necessities of the situation actually required with the right of one to engage in a common and useful occupation for which he is qualified.

In the statute under consideration, it clearly appears that the evil at which it was aimed was the public harm which might result from the hurtful ministrations of quacks and charlatans fraudulently pretending to be qualified optometrists. It recognized the fact that one qualified to serve as an optometrist might nevertheless be incompetent to render the service which might be required of a physician or a surgeon; it therefore prohibited optometrists from using the title "Doctor," "Physician," "Eye Specialist," or any title containing the word "Doctor" or any word or abbreviation conveying the impression that the optometrist is engaged in the treatment of injuries to or diseases of the human eye, or that he may make use of drugs, medicine, or surgery in the practice of optometry, although if holding a degree of doctor of optics or doctor of optometry the optometrist may use that title. And, although disregarded by all the natural appellants but one, the statute further provides that: "Any optometrist practicing Optometry in the State of Maryland must use the word Optometrist and the word Optometrist only, in connection with his name wherever said name appears except as provided for in Section 327." Code (Supp. 1935) art. 43, sec. 327A. (Section 327 exempts from the act physicians, surgeons, opticians, and dealers in eyeglasses, spectacles, or lenses not engaged in the practice of optometry nor professing to be so engaged.) It further provides that: "It shall be unlawful for any person to knowingly sell to or prescribe glasses for persons with diseased eyes except it be with their knowledge and consent or on an order of or ad-

vice from a registered physician, or to sell to or prescribe concave glasses for a person under fifteen years of age except on an order of or advice from a registered physician. It shall not be construed as a violation of this section for a person to sell a duplicate or replace glasses for such cases cited in this section." Code, art. 43, sec. 324.

These provisions sufficiently manifest an intention that no one shall be permitted to physically and manually practice the calling of optometry in this state who does not possess the qualifications required by the statute, and who does not hold the registration certificate to be issued by the board as an evidence of such qualification. The adequate protection of the public health required no more than that, and beyond that the Legislature did not go. In Code, art. 43, sec. 315, it defined the "practice of optometry" in the words quoted above, and in section 316 it construed that definition, providing that: "It shall be construed as practicing optometry for any person to prescribe, give directions or advise as to the fitness or adaptation of a pair of spectacles, eyeglasses or lenses for another person to wear for the correction or relief of any condition for which a pair of spectacles, eyeglasses or lenses are used, or to use or permit or allow the use of instruments, test cards, test types, test lenses, spectacles or eyeglasses or anything containing lenses, or any device for the purpose of aiding any person to select any spectacles, eyeglasses or lenses to be used or worn by such last mentioned person or by any other person." In the same section it further provided that no person should practice optometry as thus defined in this state without a certificate of examination, or a certificate of registration issuable to persons engaged in the practice of optometry on April 13th, 1914.

That definition, as construed by the statute itself, applies only to service rendered personally by the optometrist to his patron and to the manual, physical, personal practice of the art. It does not make it unlawful to employ and sell the service of an optometrist, nor does it

make it unlawful for an optometrist to contract with another, upon such terms as he deems proper, to serve such patrons as may be sent to him by or on behalf of the other. Nor does it make it unlawful for his employer to advertise to the public that he will through the agency of a registered optometrist furnish such service to those who may apply therefor.

The question is, not whether the Legislature may prohibit a corporation or a lay natural person from furnishing service in a regulated employment through the agency of others, but whether it has done so in this statute, and a mere reading of the statute demonstrates that it has not.

The contention that optometry is a learned profession, and that a sound public policy denies the right to any one to exploit and commercialize it by furnishing the service incident to the business through the agency of others, as a legal proposition is unsound. Apart from the statute, there could be no possible question of the right of any one to practice the art unless his incompetence made such practice a fraud, nor could there be any question of the right of one, not himself an optometrist, to employ and hire out the service of one who was, so that unless the statute forbids such a practice it is not forbidden at all. And as the acts relied upon to prove that the appellee is practicing optometry do not constitute the practice of that business as defined by the statute, they are not within its denunciation.

Again, there is no public policy which forbids the commercialization of optometry. It is undisputed that it is a general practice under the statute for registered optometrists to keep what are described as "store fronts" on which the nature of the business and the name of the proprietor are displayed, that they buy glasses and lenses at wholesale rates and sell them at retail, and that glasses are displayed in some cases in the "store fronts." It also appears that the sale of glasses and lenses commonly furnish a large part of the income from the business. The appellants by their witnesses suggested, however, that

although they bought the glasses and their patrons paid for them, they did not really sell them, but that their price was included in their charge for service. Passing that distinction, it is apparent that the business is that of testing eyesight and selling glasses, and that whatever the selling part of it may be called, it is commercial in its nature and that to prohibit its commercialization would be to prohibit the business altogether.

Whether it may be properly classified as a profession is a mere triviality and immaterial. To properly perform the work incident to its practice requires skill, intelligence, judgment, and a knowledge of such subjects as the physiology, anatomy, and pathology of the human eye, which can only be acquired by one having a satisfactory academic education. Nevertheless it is essentially a mechanical art, it deals with mechanical defects in a mechanical way, and stops when it reaches disease. Code, art. 43, sec. 324. The Legislature therefore did not deem it necessary to place upon its practice the same stringent limitations as are placed upon the practice of law and medicine, for while in the statutes relating to those professions the meaning of the word "practice" is defined in terms broad enough to include any act which by any interpretation of the word could be construed as practicing (article 43, secs. 138, 142), or is not defined at all, (Code, art. 10, sec. 1 *et seq.*), but its meanings left to the lexicons, in this case it does substitute a statutory definition of the word for that ordinarily accepted in standard English usage. Since the statute is penal in its nature, that definition is exclusive, and as the acts charged by the appellants are not sufficient to constitute the practice of optometry, the appellants were not entitled to the relief prayed in their bill.

If support were needed for that conclusion, it would be found in the long continued contemporaneous construction given the act by the administrative agencies of the State and by those engaged in the business. Although twenty-one years elapsed between the passage of the act and this suit, the usage of which the appellants now com-

plain was widespread in the business, and indeed in 1935 a bill was introduced in the Legislature to make it unlawful, but throughout that period no other attempt appears to have been made, either on behalf of the State or by any person engaged in the business, to prevent it. While that fact cannot be accepted as in any sense conclusive or controlling, nevertheless, if the act were open to construction, it would be entitled to serious consideration. 59 *C. J.* 1022 *et seq.; Graham v. Joyce,* 151 Md. 298, 134 A. 332; *Leitch v. Gaither,* 151 Md. 167, 134 A. 317; *Frazier v. Warfield,* 13 Md. 279; *Congoleum Nairn v. Brown,* 158 Md. 285, 148 A. 220; *Hess v. Westminster Bank,* 134 Md. 125, 132, 106 A. 263; *Baltimore v. Machen,* 132 Md. 618, 623, 104 A. 175; *Burroughs Adding Mach. Co. v. State,* 146 Md. 192, 198, 126 A. 127; *Arnreich v. State,* 150 Md. 91, 132 A. 430; *Leitch v. Gaither,* 151 Md. 167, 176, 134 A. 317.

No useful purpose can be served by any extended analysis of the decisions cited in support of a contrary conclusion. Some are by courts of first instance, others by intermediate courts of appeal, and several by appellate courts. Passing the decisions other than those by courts of last resort, in *State v. Kindy Optical Co.,* 216 Iowa, 1157, 248 N. W. 332, 335, the case apparently turned on the proposition that the defendant as a corporation could not obtain a license as an optometrist, and that it "could not conduct a business without a license." It does not appear that the statute there considered defined "practice," and the suggestion that one may not conduct a business without a license could not be accepted as sound in this state, unless a license is required by statute. In *Funk Jewelry Co. v. State* (Ariz.) 50 P. (2nd) 945, the statutory definition of "practice" does not appear in the opinion, nor does it appear in *Eisensmith v. Buhl Optical Co.* (W. Va.) 178 S. E. 695, *State v. Goldman Jewelry Co.,* 142 Kan. 881, 51 P. (2nd) 995, *Eddy v. West Virginia Board of Optometry* (W. Va.) 182 S. E. 870, or *Pacific Employers Ins. Co. v. Carpenter* (Cal. App.) 52 P. (2nd) 992. In *Teseschi v. Mathis,* 116 N. J. Law. 187, 183 A.

146, the case turned on the right of a corporation to practice optometry, while here the question is whether the appellee is practicing optometry within the meaning of the statute. These cases lend little support to the contention that appellee's course of business violates the statute. There can be little doubt that to advertise and furnish optometrical service, to charge therefor, and to collect the charge, is to practice optometry within the customary and ordinary meaning of the word practice. But here we are not dealing with the word in that sense, but with the meaning given it by the statute, and cases interpreting facts in the light of the meaning given it in ordinary literary usage, or by other different statutes, are not in point, nor for the same reason are the cases cited in support of the conclusion helpful.

Apart from the statute, there is no reason why a corporation should not employ an optometrist to aid it in carrying out contracts with its patrons, and since no such prohibition is found in the statute, the decree appealed from will be affirmed.

*Decree affirmed, with costs.*